**UNITED STATES of America**

v.

**Jason J. SMITH, Defendant.**

**Civil Action No. 98–61.**
**Criminal No. 95–2.**

United States District Court,
W.D. Pennsylvania.

Jan. 6, 2000.

Alan Ellis, Peter Goldberg, James H. Feldman, Jr., Law Offices of Alan Ellis, Ardmore, PA, Elliot J. Segel, Erie, PA, for Defendant.

Michael Ivory, Asst. U.S. Atty., Pittsburgh, PA, John Trucilla, Asst. U.S. Atty., Erie, PA, for U.S.

## MEMORANDUM OPINION

McLAUGHLIN, District Judge.

Petitioner Jason J. Smith moves this Court, pursuant to 28 U.S.C. § 2255, to vacate, set aside or correct the sentence which was imposed following his conviction by a jury on various drug charges. For the reasons that follow, Smith's motion will be denied.

### I. BACKGROUND

From approximately September 1992 to July 1994, Smith conspired to distribute anabolic steroids in the Erie area and elsewhere. Beginning in or around January 1993, Smith conspired with others to distribute marihuana. The government's evidence showed that, from January 1993 to July 11, 1994, Smith was responsible for distributing and/or possessing with the intent to distribute over 700 kilograms of marihuana.

Initially, Smith obtained the marihuana by having it shipped via a common carrier, such as United Parcel Service or Federal Express, to vacant residences throughout the Erie area. Smith or one of his associates would then retrieve the shipments from these vacant locations. The marihuana was shipped in brick form and was packaged in large metal or plastic protein powder cans. After receiving these shipments, Smith would then repackage the marihuana into smaller amounts for distribution. Tracie Mead, who was Smith's live-in girlfriend from August 1992 through January 1994, testified that she was aware of at least 5 to 10 occasions when Smith received shipments of marihuana. The government also introduced testimony from Maria "Nicky" Zafiropou-

los, another of Smith's girlfriends from January to October 1993. Zafiropoulos recalled that Smith's marihuana shipments would usually arrive in pairs—one package typically weighing approximately 60 pounds and the other weighing approximately 40 pounds. Zafiropoulos was aware of at least 10 to 15 occasions when Smith received marihuana shipments of this size.

In mid–1994, Smith made arrangements to receive a significantly larger shipment of marihuana. The government's evidence showed that Smith made several trips to El Paso, Texas, Juarez, Mexico, and Anthony, New Mexico during the Spring of 1994. On one of these trips, Smith transported a motorcycle to Texas for the purpose of trading it for marihuana. During the late evening hours of June 20, 1994, Smith and several other individuals moved a large, heavy, wooden crate from the back of a pick-up truck into a rental truck. This shipment consisted of multiple bales of marihuana, which Smith subsequently stored in his trailer. According to Greg Haas, who was Smith's close friend at the time, Smith indicated that the shipment consisted of "about 1,000 pounds" of marihuana.

An individual by the name of Paul Knobloch devised a plan to steal some of this marihuana with the help of his friend, Jeff Davis. On July 1, 1994, Davis broke into Smith's trailer and stole six full bales and one partial bale. Davis would later testify that, at the time of this theft, he saw approximately 18 to 20 bales of marihuana stored in the closet of Smith's trailer. Each bale weighed approximately 40 pounds.

When Smith later began to suspect Knobloch's involvement in the theft, Knobloch grew concerned for his own safety. He and Davis made arrangements to turn over three of the bales to the Millcreek Township Police Department. After recovering the three bales, the Millcreek police learned that Smith had posted a $10,000 reward for the return of the stolen marihuana. An agent of the Pennsylvania

Attorney General's Office contacted Smith in an attempt to work an undercover reverse-sting operation by selling the three recovered bales back to Smith. This undercover operation was later aborted after Smith learned that the agent was a law enforcement officer.

Meanwhile Smith, having become aware that he was the target of an attempted drug bust, enlisted the help of his friends to empty contraband from his trailer. Smith and a companion removed weapons, an assortment of steroids, and documentation evidencing Smith's drug dealings and hid them in a rental storage facility. Also deposited in that location was a box containing a number of vacuumed packed cans of marihuana. On July 5, 1994 Smith and Greg Haas transported six of the marihuana bales from Smith's trailer to the farm of another co-conspirator named Fred Kent. Two additional bales were hidden in the truck of a Mercedes Benz.

Eventually, the continuing investigation by state and local law enforcement agents led to the arrest of Haas in the early morning hours of July 7, 1994. Smith was arrested on state criminal charges later that same day after Haas agreed to cooperate with law enforcement officers in the investigation of Smith. Shortly before his arrest, Smith asked Haas to destroy a black book with evidence of his drug business activities, which Smith referred to as his "bible."

In early 1995, Smith was indicted on eight separate charges of federal drug and firearms violations. The nine-count superseding indictment charged Smith with conspiracy to distribute and possess with the intent to distribute marihuana (Count 1), conspiracy to distribute and possess with the intent to distribute anabolic steroids (Count 2), distributing and possessing with the intent to distribute in excess of 100 kilograms of marihuana (Count 3), possessing with the intent to distribute less than 50 kilograms of marihuana (Count 5), possessing with the intent to distribute anabolic steroids (Count 6), using and car-

rying a firearm—i.e., a .45 caliber American Arms Spectre HC pistol with laser sight and an Intratec Tec–DC9, 9 mm caliber semi-automatic pistol with barrel extension and compensator—during and in relation to a drug trafficking crime (Count 7), possession of a machine gun (Count 8), and use of a Mossberg 500A 12–gauge shotgun during and in relation to a drug trafficking crime (Count 9).[1]

Smith's case was tried before a jury in September 1995. After two and a-half weeks of trial, the jury convicted Smith on Counts 1, 2, 3, 5, and 6. The jury was unable to return a verdict as to Count 7. Count 8 was dismissed by the government prior to the conclusion of the trial. Smith was acquitted on Count 9.

At the December 27, 1995 sentencing hearing, this Court found that 866.3 kilograms of marihuana and marihuana-equivalent steroids were attributable to Smith under the relevant conduct provisions of the sentencing guidelines. Based on that figure, the Court applied a base offense level of 30. *See* U.S.S.G. § 2D1.1 (1994). The Court then adjusted the base offense level upward by two levels for obstruction of justice, two additional levels for Smith's possession of various firearms, and four additional levels for Smith's role in the offense. The Court rejected the argument that Smith should receive a two-level reduction for acceptance of responsibility. The Court also rejected the government's request for an additional upward departure based on Smith's criminal record and the number of guns involved in the case. Applying an adjusted offense level of 38

and a criminal history category of I, the Court sentenced Smith to an aggregate term of imprisonment of 240 months, to be followed by a five-year term of supervised release. *See* U.S.S.G. Sentencing Table (1994).

Smith took an appeal and asserted seven arguments for reversal of his judgment of conviction and sentence.[2] A panel of the Third Circuit Court of Appeals subsequently affirmed the judgment. On February 18, 1997, Smith's petition for writ of certiorari was denied by the United States Supreme Court.

Now represented by new counsel, Smith has presented a motion to vacate his conviction and sentence pursuant to 28 U.S.C. § 2255. He alleges that his trial counsel was constitutionally deficient in several respects, namely:

a) trial counsel incorrectly advised him that he could not plead guilty to the drug counts and still proceed to trial on the various firearm counts;

b) trial counsel was ineffective in choosing a trial strategy whereby counsel conceded Smith's guilt on the substantive drug counts (Counts 3, 5 and 6) but contested Smith's guilt on the drug conspiracy counts (Counts 1 and 2);

c) counsel failed at the time of sentencing to bring certain evidence to the Court's attention which could have resulted in the Court assigning a lower base offense level under the United States Sentencing Guidelines; and

1. Smith was not named in Count 4 of the superseding indictment.

2. The issues which counsel argued were as follows: 1) that this Court erred in finding that Greg Haas had voluntarily consented to wearing a body recording device during conversations with Smith; 2) that this Court erred in failing to suppress evidence taken from a closed container during an inventory search of Smith's vehicle; 3) that this Court should have suppressed evidence taken from Smith's residence on the ground that the police could not have relied in good faith on the

validity of the underlying search warrant; 4) that this Court abused its discretion in admitting evidence of Smith's prior drug conviction; 5) that this Court abused its discretion in denying Smith's motion for a mistrial based upon the testimony of a government witness; 6) that this Court committed clear error at the time of sentencing in denying Smith a reduction for acceptance of responsibility; and 7) that this Court committed clear error in finding at the time of sentencing that Smith possessed two weapons in relation to his drug dealing activities.

d) counsel failed to appeal this Court's application of a sentencing enhancement for obstruction of justice under § 3C1.1 of the Sentencing Guidelines.

These issues have been substantially briefed and, in addition, this Court held an evidentiary hearing on August 5, 1999 relative to the instant motion. Accordingly, Smith's § 2255 motion is now ripe for disposition.

## II. DISCUSSION

■ Pursuant to 28 U.S.C. § 2255, a prisoner in federal custody may move the court which imposed sentence to vacate, set aside or correct the sentence if it was imposed in violation of federal constitutional or statutory law, was imposed without proper jurisdiction, is in excess of the maximum authorized by law, or is otherwise subject to collateral attack. 28 U.S.C.A. § 2255 (West Supp.1999). The alleged ineffectiveness of counsel is one type of claim which may be raised in a collateral proceeding under § 2255. *See, e.g., United States v. Theodoropoulos,* 866 F.2d 587, 598 (3d Cir.1989) (unless the record sufficiently establishes a basis for direct review, the proper avenue for pursuing such claims is through a collateral proceeding), *overruled in non-relevant part, United States v. Price,* 76 F.3d 526, 528 (3d Cir. 1996).

It is well established that "[t]o succeed on an ineffective assistance of counsel claim, [the Petitioner] must show that his attorney's performance fell outside 'the wide range of professionally competent assistance,' ... and that his attorney's deficient performance resulted in prejudice." *United States v. Roberson,* 194 F.3d 408, 418 (3d Cir.1999) (quoting *Strickland v. Washington,* 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). The Supreme Court has defined "prejudice" as " 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Id.* (quoting *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052). A "reasonable probability" is a probability "sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

In reviewing counsel's performance, we are required to " 'judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.' " *Roberson,* 194 F.3d at 418 (quoting *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052). Further, our review must be " 'highly deferential,' " and we therefore " 'indulge a strong presumption' that, under the circumstances, counsel's challenged actions 'might be considered sound ... strategy.' " *Buehl v. Vaughn,* 166 F.3d 163, 169 (3d Cir.) (quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052) (ellipsis in the original), *cert. dismissed,* —— U.S. ——, 119 S.Ct. 2418, 144 L.Ed.2d 815 (1999). The Third Circuit Court of Appeals has cautioned that, "[b]ecause counsel is afforded a wide range within which to make decisions without fear of judicial second-guessing, ... it is 'only the rare claim of ineffectiveness of counsel that should succeed under the properly deferential standard to be applied in scrutinizing counsel's performance.' " *Id.* (quoting *United States v. Gray,* 878 F.2d 702, 711 (3d Cir.1989)).

### A.

Smith's first two bases for alleged ineffectiveness of counsel are interrelated and will therefore be addressed together. Smith essentially argues that, from the outset, he was prepared to concede his guilt on all of the drug charges, including the conspiracy charges set forth in Counts 1 and 2 of the superseding indictment, provided that he could contest the gun charges and that he would not be required to assist the government in the prosecution of any other individuals. Smith maintains that he conveyed this position to his trial counsel, Leonard Ambrose, but was wrongly advised by Mr. Ambrose that he was not permitted to plead guilty to some charges while proceeding to trial on other counts. Ultimately, Smith was vindicated on the gun counts, as none of those

charges resulted in a conviction. Smith now argues that, but for his counsel's errant advice, he would have pleaded guilty to all of the drug charges, including the conspiracy charges, and would likely have received a reduction in his sentence for acceptance of responsibility.

Smith further contends that Mr. Ambrose was ineffective in pursuing a trial strategy whereby he conceded Smith's guilt on the substantive drug charges but contested Smith's guilt on the drug conspiracy charges. With respect to Counts 1 and 2, Mr. Ambrose constructed a technical defense: he conceded Smith's involvement in multiple, smaller drug conspiracies but argued that the proof was insufficient to convict Smith of the single, unified conspiracies alleged in the superseding indictment. Smith now contends that this strategy was unsound because, in essence, it involved a risk without any potential benefit. The risk was that, by contesting his guilt on the conspiracy charges, albeit through a technical defense, counsel compromised Smith's ability to later achieve a sentence reduction based on acceptance of responsibility. This risk, Smith argues, lacked any justification because there was no potential benefit that would result from an acquittal on the drug conspiracy charges. Smith accurately notes that, even if his trial counsel had successfully defended the drug conspiracy counts, an acquittal on those charges would not have reduced his sentence of imprisonment because, in any case, the applicable base offense level would have been determined from the amount of drugs involved in the substantive drug counts. Thus, Smith argues, an acquittal on Counts 1 and/or 2 would have been a hollow victory.

(1)

■ We first consider the allegation that Mr. Ambrose misinformed Smith about his right to plead guilty to the drug counts. All parties appear to acknowledge that, under Rule 11 of the Federal Rules of Criminal Procedure, a defendant is legally permitted to enter a plea of guilty to certain of the charges against him without conceding guilt on all the pending charges, provided that the guilty plea is intelligently and voluntarily given and that the district court accepts the plea. *See* Fed. R.Crim.P. 11. Thus, Smith was not legally compelled under the Federal Rules of Criminal Procedure to enter a uniform plea of "guilty" or "not guilty" as to all of the charges in the superseding indictment. However, there is a conflict in the evidence as to whether Smith's counsel accurately informed him of his rights under Rule 11.

■ At the hearing on the instant motion, Smith acknowledged that he and Mr. Ambrose had met many times during the course of his criminal proceedings to discuss various aspects of the case. Smith testified that, prior to trial, he had communicated to counsel his willingness to plead guilty to all of the drug counts, provided that he could contest the gun counts and that he would not have to cooperate with the government against other individuals. Basically, he claims that the only reason he did not plead guilty to Counts 1 and 2 was that Mr. Ambrose advised him he could not plead guilty to the drug counts without also pleading guilty to the gun counts. Because Smith was not willing to concede guilt on the gun counts, he decided to plead not guilty to all charges.

With respect to trial strategy, Smith claims Mr. Ambrose explained that he would concede Smith's guilt on Counts 3, 5 and 6 in light of the overwhelming evidence against Smith and Smith's own admissions of guilt on those charges. As to the drug conspiracy charges, Mr. Ambrose explained that he intended to construct a technical defense whereby he would argue that Smith had engaged in multiple conspiracies, rather than the single, unified conspiracies charged in the indictment. Further, Mr. Ambrose allegedly explained that he would defend the gun charges by arguing that the guns were not involved in the drug offenses. Smith maintains that, while Mr. Ambrose explained *how* he would defend the drug conspiracy charges in Counts 1 and 2, he never explained *why*

a defense on those charges was tactically advantageous or necessary. Smith also asserts that, prior to trial, Mr. Ambrose never discussed with him his potential sentence under the United States Sentencing Guidelines, other than to inform Smith that he was facing a potentially long sentence on the drug charges and that any sentence imposed on the gun counts would run consecutively to the sentence imposed on the drug counts. In addition, Smith contends that he never received any explanation prior to trial of the impact which an acceptance of responsibility might have on his sentence.

After his jury trial and while he was awaiting sentencing on the drug charges, Smith and Mr. Ambrose met to discuss the Presentence Investigation Report ("PSI") prepared by the United States probation officer. Among other things, the PSI recommended that Smith be given credit for a 2–point reduction in his offense level for acceptance of responsibility. The basis for this recommendation was that, in taking his case to trial, Smith had challenged the scope of the indictment but not his guilt. Smith testified that, during a meeting with Mr. Ambrose to discuss the PSI, Mr. Ambrose anticipated that the government would oppose the probation officer's recommendation. Nevertheless, according to Smith, Mr. Ambrose indicated he was confident that the defense would prevail on this point because Smith had not had the option at trial of pleading guilty to the drug counts while proceeding to trial on the gun counts. Mr. Ambrose allegedly explained to Smith that, because the court had not permitted severance of a gun count in a different case, *United States v. DiLoreto*, there likewise had been no option to sever the drug and gun counts in Smith's case; thus, Smith had had no choice but to proceed to trial on all counts.

In support of his testimony, Smith points to Mr. Ambrose's subsequent reference to the *DiLoretto* case during argument at his sentencing—an issue which requires some background discussion for purposes of context. In stating its position with regard to Smith's sentence, the gov-

ernment had strongly opposed the PSI's recommendation of a 2–level reduction for acceptance of responsibility. The government argued that Smith's contrition was neither timely nor sincere, as demonstrated by the fact that he had disputed his guilt and put the government to its burden of proof on the drug conspiracy and gun counts. The government further submitted that, if Smith had truly wanted to challenge only the scope of the indictment, he could have gone to trial on less than all of the charges by moving under Fed. R.Crim.P. 14 to sever out those counts whose scope was being challenged and by pleading guilty to the remaining counts whose scope was not being challenged. Alternatively, the government argued, Smith could have entered a general plea of guilty to all charges and argued the scope of the indictment at time of sentencing. (*See* Govt.'s Objections to Presentence Report and Position With Respect to Sentencing Factors [Doc. No. 161] at 6–12.)

In responding to the government's objection, Mr. Ambrose pointed out that the government had successfully opposed a Rule 14 severance in the case of *United States v. Patrick DiLoreto, et al.*, Criminal No. 88–9 Erie. In that case, presided over by the Honorable Maurice B. Cohill, Mr. Ambrose had moved pretrial to sever from the indictment a count which charged DiLoreto with unlawfully possessing a firearm as a convicted felon. The defense had sought to sever that count and place the guilty plea under seal in order to prevent DiLoreto from being prejudiced during his trial on the drug counts by the government's introduction of evidence that DiLoreto was a convicted criminal. The government opposed the motion on the ground that severance would be unfair and argued that it ought to be able to prove its case as it saw fit. Judge Cohill ruled in favor of the government on the ground that it would establish a "bad precedent" to allow "piecemeal pleading." (*See* Def.'s Resp. to Govt.'s Objections to Pre–Sentence Report and Position With Respect to

Sentencing Factors [Doc. No. 163] at 9–13.)

The issue was specifically discussed on the record at Smith's sentencing hearing when this Court asked Mr. Ambrose about the possibility, in hindsight, of a Rule 14 severance in Smith's case: Mr. Ambrose responded:

> Well, let's talk about that. The Government offers two alternatives; a Rule 14 severance and a general plea. Those are the two alternatives. A Rule 14 severance, Your Honor, we tried that in DiLoreto. DiLoreto II, we had a gun count. We filed a motion to sever out the count, and we said, he'll plead under seal so no one knows about it and the jury can't learn about it, because we don't want to contaminate the jury. The Government objected. The Government said, oh, no, that's part of the tools of the trade. So we can have the expert testimony. You know, we have the gun in and all the other things like that. Judge Cohill said, that's correct, the Government can try the case however they want to try the case. And that was precedent. That was written up in an opinion.[3]

So that's a good faith basis.

(Tr. of 12/27/95 Sentencing [Doc. No. 199] at 65.)

In responding to the government's argument that Smith could have entered a general plea of guilty to all charges if he had wanted to accept his responsibility, Mr. Ambrose asserted that this had not been an acceptable alternative for Smith because Smith had consistently maintained his innocence on the gun counts. Further, Mr. Ambrose noted that a general plea of guilty would have precluded an argument at time of sentencing on multiple conspiracies, since this *is a trial defense, not a sentencing issue.* (Def.'s Resp. to Govt's Objections to Pre–Sentence Report and Position With Respect to Sentencing Fac-

tors [Doc. No. 163] at 9–13; Tr. of 12/27/95 Sentencing [Doc. No. 199] at 65.)

Smith now submits that his counsel's arguments at time of sentencing demonstrate a fundamental misconception concerning Smith's ability to plead guilty on the drug counts. The suggestion is that Mr. Ambrose errantly believed Smith was legally precluded from entering a mixed plea based on the precedent set by Judge Cohill in the *DiLoreto* case.

To further buttress this claim, Smith relies on a letter from his assistant trial counsel, William Weichler, which was composed on September 27, 1996 in anticipation of oral argument in Smith's direct appeal from his conviction and sentence. (*See* 9/27/96 letter of William Weichler, Esq., appended to Supplement to Def.'s Mem. in Supp. of Mot. to Vacate Conviction and Sentence [ Doc. No. 244].) That letter states, in relevant part:

> Leonard and I have recently discussed the appropriate way to argue the acceptance of responsibility issue. I, like you, was hung up on justifying our decision to go to trial and defend the conspiracy counts as charged in the indictment. Leonard put that to rest real quick. Leonard pointed out to me that *our decision to go to trial was dictated to us by the government. The government dictated that trial decision by virtue of including the gun counts in the indictment. We had no option of severing off certain counts, pleading guilty and going to trial on the remaining counts.* The fact that we interposed a defense to the conspiracy charges is meaningless because we admitted the substantive drug dealing conduct. Ultimately, your sentence on the drug counts would have been the same whether we were successful or unsuccessful in our defense on the conspiracy charges. The amounts of drugs involved in the

---

**3.** In fact, there was never any written opinion on this matter in *DiLoreto.* Instead, it appears that Judge Cohill rendered a bench ruling on the motion for severance. (*See*

Def.'s Suppl. Mem. in Supp. of Def.'s Mot. to Vacate Conviction and Sentence [Doc. No. 258], Ex. A at 491a.)

charges control the sentence. It all would have been factored in at sentencing under the relevant conduct provision of the Sentencing Guidelines. *But for the gun charges, you would have plead [sic] guilty. You would have then received a 3 point reduction for acceptance of responsibility. It was the gun charges that prevented your plea.* The jury ultimately vindicated your decision regarding those counts. . . . You fully accepted your responsibility. The fact that you challenged the structure of the conspiracy allegations does not minimize that acceptance. It's meaningless in the overall scheme of the case. Your sentence would have been the same regardless of our success on that defense.

(*See id.* (emphasis supplied).)

Smith testified that Mr. Weichler's statement, "I, like you, was hung up on justifying our decision to go to trial and defend the conspiracy counts," was written in response to concerns which Smith had raised verbally to his counsel in connection with the defense team's appellate challenge to this Court's denial of acceptance of responsibility. Smith asserted that, even prior to trial, he had voiced concern about the multiple conspiracy defense and had never understood Mr. Ambrose's purpose in defending the drug conspiracy charges because Mr. Ambrose never explained his reasons for employing that defense.

At the § 2255 hearing, Smith also proffered the testimony of his wife, Beth Richter, who was closely acquainted with Smith in June of 1995. The parties stipulated that, if called, Ms. Richter would testify that Smith told her in June of 1995, and again one year later, that he did not want to go to trial on the drug counts, that he wanted to plead guilty to the drug counts and go to trial on the gun counts, but that his counsel had advised him that he could not.

Smith's version of events was contradicted in certain material respects by the testimony of Messrs. Ambrose and Weichler. Insofar as Smith's interest in entering a mixed plea is concerned, Mr. Ambrose acknowledged that, during the course of their extensive conferences, Smith asked him about his various legal options, including the option of pleading to all of the drug charges and contesting only the gun counts at trial. Mr. Ambrose maintained that Smith was accurately advised that he had the right, under Fed.R.Crim.P. 11, to plead guilty to any charges, provided that the court accepted the plea. Nevertheless, according to Mr. Ambrose, Smith was strongly advised against entering a guilty plea to the drug conspiracy counts because, in Mr. Ambrose's opinion, it was sounder defense strategy to contest the conspiracy charges in light of the various gun charges.

Mr. Ambrose explained that the firearms violations charged in Counts 7, 8 and 9 had been the primary focus of the defense team's attack because they carried substantial potential jail sentences which would necessarily run consecutively to any sentence Smith might receive on the underlying drug charges. Furthermore, Smith had always maintained his innocence on the gun charges. Thus, in Mr. Ambrose's words, the gun charges were the "tail that wag[ged] the dog." (Tr. at 75.) Mr. Ambrose testified that he had felt it was prudent for Smith to contest the drug conspiracy charges at trial because, in doing so, he could strategically attack the gun charges at the same time. That is, in attacking the government's allegation of a unified international drug conspiracy,[4] he was able to argue that the government had overcharged Smith with respect to both the drug conspiracy counts and the gun counts. Mr. Ambrose stated that he had felt it was important to undermine the government's portrayal of Smith as the

**4.** In testifying at the § 2255 hearing, Mr. Ambrose referred to the conspiracies as alleged "multi-national" conspiracies. In actuality, the evidence at trial connected Smith to conspiratorial activity in the United States and Mexico only. Accordingly, it is probably more appropriate to refer to the conspiracy as "international," rather than "multi-national."

ringleader of a large, interstate and international drug conspiracy because, in his view, such a ringleader would be exactly the type of person who would be likely to use firearms in furtherance of drug crimes, just as the government had charged. Accordingly, Mr. Ambrose thought it imprudent for Smith to concede guilt on Counts 1 and 2 because, by doing so, Smith would be "playing into the government's hands" with respect to the gun counts.

In testifying at the § 2255 hearing, Mr. Ambrose flatly denied ever misinforming Smith about his legal right to enter a guilty plea on the drug conspiracy counts. He acknowledged that Smith inquired about his pleading options, but claimed that Smith never "point blank" stated that it was his desire to plead guilty to all of the drug charges. Moreover, Mr. Ambrose emphatically denied Smith's allegations that he failed to give any pre-trial explanation as to *why* the drug conspiracy charges ought to be contested or how the sentencing guidelines would apply to Smith in the event of a conviction. With respect to the issue of *DiLoreto* and his advice to Smith, Mr. Ambrose testified as follows:

Q. Why don't you relate to the court what he told you about his desire to plead guilty to what was charged, just go back and refresh the court's recollection as to what your response was to him, whether or not you told him he couldn't do that?

[By Mr. Ambrose:]

A. I discussed this with Jason, I said, look it, you can plead to any count you want in the indictment, under Rule 11 the plea has to be offered to the court, whether the court accepts it or not is another issue, you can do that. But I explained to him that it would be foolish, would be tactically foolish to plead to counts one and two and admit what the government says your role was because it would diminish the strength of your argument on the gun counts. And the one thing he wouldn't do is

plead to the gun counts, coupled with he wouldn't cooperate.

\* \* \* \* \* \*

Q. Did you tell him specifically that he was legally precluded or was absolutely barred from pleading the way he wanted to?

A. No, I told him you could offer a plea to anything under Rule 11, it's up to the court whether or not to accept, the court would entertain any objection the government had, but it is up to the court whether they accept it. I said it was academic because to plead to those counts would diminish the effect, the force of our theory and our arguments on the gun counts. Which were the key things because of the onerous, enormous penalties that would be consecutive to the marihuana.

Q. Did you discuss the *DiLoretto* case and the issue of severance?

A. I discussed that in the context that the plea would have to be offered to the court. That was a different case. The purpose of that plea being offered was to keep out a prior conviction.

THE COURT: Just so I'm clear, if I could interrupt, Mr. Trucilla, are you testifying that you told him that it would be up to me and left in my discretion as to whether I would accept a plea to less than all of the charges?

[MR. AMBROSE]: What I said to him, your Honor, is he could plead if he wanted to, that was his prerogative. But any plea has to be proper [sic] to the court under Rule 11, okay, and the court has to make a determination on whether or not it will accept the plea on the record. I told him that could be done, and then I explained to him, as I did on many occasions, how it would tactically disadvantage our argument on the gun counts. It admitted a ringleader role, when the government was trying to prove that was his role, to show that he was the type of person who would be more likely to be in a position to need

the use of the gun to protect the drugs and to protect the money.

BY MR. TRUCILLA:

Q. Based on your experience with these types of cases, you have dealt with this issue before, had you dealt with severance issues and joinder issues in previous matters?

A. Yes.

Q. Did you discuss with him what you believed the government's perspective would be to a pick and choose method of pleading in this particular matter?

A. I indicated to him that based on prior experience, the government would move to oppose, particularly in this case, because the government would have to, in all probability, not in all probability, they would have to prove all of the drug activity in order to make the gun counts. However, I went back to my original argument that it would be absolutely foolish to do that because it would diminish our argument that the guns weren't connected to the conspiracy, it would [be] playing into the government's hands.

\* \* \* \* \* \*

Q. The question was when Mr. Smith testifies here that you only told him how you were going to go about your strategy, not why you were going to do that, that would be incorrect?

A. That's absolutely wrong.

(Tr. of 8/5/99 Hearing on Mot. to Vacate Conviction and Sentence [Doc. No. 257] at 84–87.)

Mr. Weichler likewise denied that Smith was ever misinformed about his right to plead guilty on the drug charges. He also specifically recalled being present for pre-trial discussions wherein Mr. Ambrose explained to Smith his reasoning as to why a defense of Counts 1 and 2 was tactically advantageous. Mr. Weichler testified that, even before going to trial, Smith was made aware of the fact that an acquittal on Counts 1 and 2 would not affect his sentence, but he nevertheless concurred with the trial strategy of defending the drug conspiracy counts.

At the § 2255 hearing, Smith's present counsel questioned Mr. Weichler about the above-quoted language in his September 27, 1996 letter to Smith—particularly his statement that Smith had "no option of severing off certain counts, pleading guilty and going to trial on the remaining counts." Mr. Weichler explained that this letter was intended to paraphrase the position which he would argue to the Third Circuit Court of Appeals in the context of challenging this Court's denial of a reduction for acceptance of responsibility. He maintained that, in stating that Smith had "no option" of pleading guilty to certain counts, he meant that Smith had had no *practical* option under the circumstances of pleading to the drug conspiracy charges—not that Smith had been legally precluded from doing so. Mr. Weichler further claimed that he had used the term "sever" not in the strictly legal sense as it is used in Fed.R.Crim.P. 14, but "in the context of separating the charges of conspiracy and drugs and pleading to them, and then going to trial on the drug counts." (Tr. of 8/5/99 at 216.)

*FINDINGS OF FACT*

With respect to Smith's first allegation of ineffectiveness of counsel, the Court makes the following findings of fact:

1. Mr. Ambrose began representing Smith shortly after his arrest on state charges and continued representing him through his appeal and the denial of certiorari by the United States Supreme Court. During the course of Mr. Ambrose's representation, he and Smith spent numerous hours discussing various aspects of Smith's case, from pre-indictment status, to indictment, to pre-trial detention, to suppression issues, to trial strategy, to sentencing and appeal issues.

2. After Smith was federally indicted, he and Mr. Ambrose discussed Smith's various legal options. Smith expressed interest in negotiating a plea with the government, but was accurately advised by Mr. Ambrose that the government would

not be interested in negotiating a plea under terms acceptable to Smith.

3. During the course of their pre-trial conferences, Mr. Ambrose and Smith discussed the potential jail exposure which Smith faced on Counts 7, 8 and 9. Mr. Ambrose informed Smith of the fact that he could potentially face fifty years or more in prison on the gun charges, in addition to the sentence which would likely be imposed on the substantive drug charges. Accordingly, Mr. Ambrose believed that the primary strategy of Smith's defense should be to challenge the gun charges in Counts 7, 8 and 9 because of the heavy mandatory sentences that would be imposed in the event of a conviction and because of Smith's own insistence of his innocence on those charges. Smith concurred with this basic strategy decision.

4. Prior to Smith's arraignment on the superseding indictment, Smith inquired about the possibility of entering a mixed plea, i.e., pleading guilty to all of the drug charges (including Counts 1 and 2) and going to trial on the gun charges. Mr. Ambrose advised Smith that, although Smith had a right to tender a plea of guilty on any charge, under Rule 11 the court would ultimately have to determine whether to accept any plea and would entertain any objections raised by the government. Mr. Ambrose never advised Smith that Smith was legally precluded from entering a mixed plea. However, he may have advised Smith that the government would likely oppose entry of a mixed plea, based on his past experience with the prosecuting attorney. Mr. Ambrose may also have communicated to Smith that the district court had been unreceptive to piecemeal pleading in the past.

5. Mr. Ambrose further advised Smith that, in any case, a guilty plea on the drug conspiracy counts was not strategically in Smith's own best interest. Mr. Ambrose counseled Smith that it was tactically most advantageous to construct a technical defense with regard to those counts because, in doing so, the defense could simultaneously attack the gun charges. This finding is buttressed by Smith's own testimony that, when he inquired about the option of entering a guilty plea to all of the drug charges at the arraignment on the superseding indictment, Mr. Ambrose informed him that this was not an option because the guns and drugs were inextricably intertwined. We find that, in actuality, Mr. Ambrose advised Smith that a guilty plea on the drug conspiracy counts, although perhaps legally permissible, was not a good option for practical reasons because, in Mr. Ambrose's opinion, an admission of the drug conspiracy charges would undermine Smith's position vis a vis the gun charges. Thus, the defense of the drug conspiracy charges and the gun charges were inextricably intertwined in Mr. Ambrose's view.

6. Smith accepted Mr. Ambrose's advice and defended Counts 1 and 2, along with the gun counts, at time of trial.

7. Following Smith's conviction on the drug counts, Mr. Ambrose met with him to discuss sentencing issues. Although Mr. Ambrose had successfully persuaded the probation officer that a 2–level reduction for acceptance of responsibility was appropriate, Mr. Ambrose expected that the government would contest this point. Mr. Ambrose most likely communicated to Smith his intent to argue, under *Alborola–Rodriguez*, that an acceptance of responsibility reduction should be awarded despite Smith's decision to defend the drug conspiracy counts. Mr. Ambrose intended to make the same argument that he had advanced to the probation officer: that in going to trial, Smith had not denied his drug dealing activities but had merely challenged the scope of the conspiracies as framed in the indictment.

8. At some point prior to the sentencing hearing, Mr. Ambrose and Smith discussed the government's position that Smith should have moved for a severance if he had wanted to challenge only the scope of the indictment. Mr. Ambrose communicated to Smith how he would respond to this challenge—namely, by point-

ing out that the same prosecuting attorney had successfully opposed a severance in the *DiLoreto* case.

9. Mr. Ambrose did subsequently respond to the government's "severance argument" in this fashion, both in Smith's pre-sentence position papers and at the sentencing hearing itself. Essentially, Mr. Ambrose suggested to this Court that a Rule 14 severance was not a likely option for Smith in light of the government's position, and Judge Cohill's ruling, in *DiLoreto*. Mr. Ambrose argued to this Court that Judge Cohill had established a local precedent against "piecemeal pleading" in his bench ruling.

10. Mr. Ambrose was undoubtedly aware that the "precedent" established by Judge Cohill's ruling was at most persuasive, and not binding on this Court. Consistent with this awareness, we find it extremely unlikely that Mr. Ambrose would have advised Smith, prior to trial, that *DiLoreto* created an absolute legal impediment to the proffering of a mixed guilty plea.

11. Nevertheless, despite his awareness that the ruling in *DiLoreto* was not binding in Smith's case, Mr. Ambrose somewhat overstated the legal import of the *DiLoreto* ruling when he suggested at Smith's sentencing hearing that, based on Judge Cohill's ruling, a severance was not a viable option for Smith. To the extent that Mr. Ambrose may have hyperbolized the legal effect of that ruling, this is attributable to the fact that Mr. Ambrose was acting as an advocate and attempting to frame his "acceptance of responsibility" argument in the best possible light.

12. After Smith lost the acceptance of responsibility argument at his sentencing, the issue was framed for appeal. Mr. Weichler pursued the original strategy of arguing that, under *Alborola–Rodriguez*, Smith's decision to defend the drug conspiracy counts did not necessarily preclude a finding of acceptance of responsibility. Smith concurred with the manner in which Mr. Weichler drafted this appellate argu-

ment in his brief to the Third Circuit Court of Appeals.

13. At some point prior to the appellate argument—possibly after reading the government's appellate brief—Smith voiced concern over how the defense should square its argument for acceptance of responsibility with the decision to proceed to trial on the drug conspiracy counts. Mr. Weichler responded to this concern in his correspondence of September 27, 1996 when he wrote, "I, like you, was hung up on justifying our decision to go to trial and defend the conspiracy counts as charged in the indictment." In writing that sentence, Mr. Weichler was not referring to any concern as to the wisdom of the initial trial strategy to defend the drug conspiracy counts. Rather, he was referring to the fact that the appeals court, like this Court, might find Smith's decision to defend Counts 1 and 2 to be inconsistent with an acceptance of responsibility.

14. In the remainder of Paragraph 5 of his letter, Mr. Weichler essentially articulated to Smith, in argumentative fashion, how this issue would be addressed to the Third Circuit Court of Appeals. As set forth in the letter, Mr. Weichler intended to argue to the Court of Appeals that Smith's resolve to go to trial had been "dictated" by the government's decision to include the gun counts in the superseding indictment. In essence, Mr. Weichler was conveying to Smith that he intended to make the same arguments Mr. Ambrose had made at the sentencing hearing: i.e., that a plea of the guilty on *all* charges had not been a viable option for Smith because of the gun counts, and that pleading guilty separately to the drug charges was not a practical option in light of the ruling in *DiLoreto*. This conclusion is supported by Mr. Weichler's argument before the Circuit panel just days later:

And lastly Your Honor, on acceptance of responsibility, the difference between *Alborola–Rodriguez* and this situation is a difference without a, excuse me, a distinction without a difference. Jason Smith was being asked to plead guilty to

these gun counts, exposing him to 45 to 50 years, if I am calculating 924(c) correctly, in order to get an acceptance-of-responsibility two-point reduction. And on the severance aspect, we had specifically attempted to sever a gun count in a previous case in the Western District of Pennsylvania, before Judge Cohill—*DiLoreto II.* And our attempt to do so was objected to by the government; and Judge Cohill ruled that we were not entitled to do so. So there is strong local precedent against that severance procedure recommended now by the government.

(Argument of 9/30/96.)

15. Like Mr. Ambrose at time of sentencing, Mr. Weichler perhaps overstated to some extent the import of the *DiLoreto* ruling, both in his letter to Smith and in his oral argument before the court of appeal. However, we do not construe this hyperbole as evidence that Mr. Weichler was fundamentally misinformed about Smith's legal right under Federal Criminal Rule 11. Rather, we find that Mr. Weichler was merely trying to rebut the government's argument against a finding of acceptance of responsibility in the most effective manner. Mr. Weichler needed to frame Smith's argument for acceptance of responsibility in the most favorable light. He did so by emphasizing the precedent set in *DiLoreto,* thereby suggesting that this Court would not have been receptive to a mixed plea and that Smith therefore had a good faith basis for not pursuing that option. However, nothing in Mr. Weichler's letter or argument to the court of appeals persuades us that either he or Mr. Ambrose actually misinformed Smith about his right to enter a mixed plea.

In arriving at the foregoing findings of fact and concluding that Smith was accurately informed of his rights under Rule 11, this Court generally credits the testimony of Messrs. Ambrose and Weichler. In making this credibility determination, we note that Smith's primary trial counsel, Leonard Ambrose, is a seasoned trial attorney with extensive knowledge and experience in the area of criminal defense advocacy. His level of experience belies the claim that he would have labored under such a fundamental misconception, *to wit,* that Smith was *legally* and absolutely precluded from pleading to less than all of the charges. Whatever Mr. Ambrose's past experience in the *DiLoreto* case had been, it is axiomatic that the ruling of one district judge, especially an oral ruling from the bench, is not binding precedent for another district judge presiding in the same district. *See, e.g., Threadgill v. Armstrong World Indus., Inc.,* 928 F.2d 1366, 1371 and n. 7 (3d Cir.1991) (citing authorities). Therefore, this Court is confident that Mr. Ambrose not only knew the law concerning Smith's rights under Fed. R.Crim.P. 11, but also accurately informed Smith of his rights. We also credit Mr. Ambrose's representation that all aspects of Smith's case were discussed with him in a timely fashion, including the implications under the Federal Sentencing Guidelines concerning Smith's decision to contest Counts 1 and 2 of the superseding indictment. This finding is buttressed by undisputed evidence that Smith and his attorneys had an open line of communication and spent numerous hours meeting and discussing the various aspects of Smith's case.

The Court observes that, in testifying before the Court, both Mr. Ambrose and Smith were able to recount the substance of their conversations in substantial detail. Nevertheless, the Court credits Mr. Ambrose's version of events because, under the circumstances, Mr. Ambrose would undoubtedly have had a better comprehension of what he conveyed to Smith and the significance of the information that was being conveyed. Smith certainly is an intelligent and articulate individual who demonstrated an above-average understanding of the issues in his case. Nevertheless, as a layperson with less sophisticated knowledge of the law, Smith would be less likely to accurately recall the important details of his conferences with Mr. Ambrose, especially given the complexity of his case, the number of issues that needed to be discussed, and the emotional

stress that Smith admittedly was suffering at the time. At the evidentiary hearing, Smith's present attorneys attempted to attack Mr. Ambrose's credibility by suggesting that the latter was simply defending an errant trial strategy with post-hoc justifications. But if potential bias is the inquiry, we must conclude that Smith, now a convicted felon, has a far stronger motive for bias, given his unenviable position of serving out a twenty-year prison term.[5]

In sum, with respect to Smith's first allegation of ineffectiveness of counsel, we find that Smith has failed to prove by a preponderance of the credible evidence that he was misinformed of his right to enter a guilty plea on the drug charges. We further find that Smith was never denied the opportunity to make his own decision concerning a guilty plea to those charges, but concurred with the strategic assessments of his counsel. Accordingly, Smith's first argument for relief under § 2255 is rejected.

### (2)

■ Smith also contends that Mr. Ambrose was ineffective in advising him to challenge Counts 1 and 2 of the superseding indictment. He argues that there was no realistic benefit to this strategy, only the danger of losing credit for acceptance of responsibility. He challenges Mr. Ambrose's theory as to why a defense of Counts 1 and 2 was necessary. In essence, Smith submits that this trial strategy was unsound, was never in fact advanced to the jury, and is a mere post-hoc fabrication. This Court disagrees.

As we note above, it was Mr. Ambrose's testimony that, following Smith's indictment on federal charges, the primary concern from the defense team's perspective was the gun counts because of the severity of the penalties and because Smith had maintained his innocence on those charges. Counts 7 and 9 each charged Smith with violations of 18 U.S.C. § 924(c). A conviction under that provision results in a mandatory minimum jail sentence of five years consecutive to any other sentence imposed by the court. Significantly, however, one of the weapons charged in Count 7 was a semi-automatic assault weapon,[6] which meant that Smith would have faced a mandatory, consecutive ten-year jail term on that count alone, if convicted of using or carrying that weapon. *Id.* Even worse for Smith, this same weapon was equipped with a barrel extension and compensator, which arguably could qualify as a "firearm muffler"—an aggravating factor which would have enhanced the mandatory consecutive sentence on Count 7 to thirty years. *Id.*[7] Furthermore, if Smith were

---

**5.** The Court acknowledges the stipulation concerning the testimony that Ms. Richter would have proffered. However, as Smith's wife, Ms. Richter shares a strong interest in the outcome of his case. Her credibility, therefore, is likewise suspect.

**6.** Count 7 charged that Smith knowingly used and carried, *inter alia,* "an Intratec Tec DC9, 9 mm caliber semi-automatic pistol, ... with barrel extension and compensator, during and in relation to a drug trafficking crime."

**7.** Smith claims that the sentencing enhancement for a thirty-year term under Count 7 was not a realistic threat because any such enhancement would have needed to be charged in the indictment. Smith cites no law to support this proposition and we have found none from this circuit that would have settled the issue at the time of the alleged ineffective conduct. We note, however, that there has been case law from other circuits

holding that the increased penalties under § 924(c) based on the type of firearm involved is a sentencing enhancement, rather than an element of the offense. *See, e.g., United States v. Eads,* 191 F.3d 1206, 1212–14 (10th Cir. 1999), *cert. denied* —— U.S. ——, 120 S.Ct. 2663, 147 L.Ed.2d 277 (1999); *U.S. v. Alborola–Rodriguez,* 153 F.3d 1269, 1272 (11th Cir. 1998) (type of firearm involved in § 924(c) offense is not a question for the jury but a sentencing question to be resolved by the sentencing court by a preponderance of evidence), *cert. denied,* 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999); *United States v. Branch,* 91 F.3d 699, 740 (5th Cir.1996) (government need not charge in the indictment nor must the jury find as part of its verdict the particular type of firearm used or carried by the defendant). *But see United States v. Alerta,* 96 F.3d 1230, 1235 (9th Cir. 1996) (character of firearm is an element of the offense which must be found by the jury); *United States v. Sims,* 975 F.2d 1225, 1235

then also convicted on Count 9, this would have counted as his "second or subsequent conviction" under § 924(c)(1), thus subjecting Smith to an *additional* mandatory twenty year consecutive sentence. *See Deal v. United States*, 508 U.S. 129, 131–32, 113 S.Ct. 1993, 124 L.Ed.2d 44 (1993). Count 8, which was not dismissed by the government until trial was well underway, charged Smith with unlawfully possessing a machine gun in violation of 18 U.S.C. § 922(*o*). The maximum statutory term of imprisonment for that charge was ten years. *See* § 924(a)(2). Thus, as a fundamental point, the record supports Mr. Ambrose's view that the gun counts were the "tail that wagged the dog" in Smith's case.[8]

While Smith faced these daunting firearms charges, his circumstances did not provide his attorney much maneuverability from a tactical standpoint. Smith had already resolved against cooperating with the authorities, which lessened Mr. Ambrose's bargaining power with respect to the gun charges. Mr. Ambrose felt Smith needed to concede the substantive counts in order to maintain credibility with the jury, a decision that was hardly unreasonable in light of the overwhelming evidence against Smith. Thus, Mr. Ambrose was unable to effectively contest Smith's drug activity but needed to somehow defend the gun charges.

Ultimately, Mr. Ambrose decided it was most prudent to defend the gun charges at trial and construct a technical defense to the drug conspiracy counts. Mr. Ambrose testified that he advised Smith to contest the drug conspiracy charges because, in his view, *not* contesting them would play into the government's theme that Smith was a big-time drug dealer who was using weapons in connection with his business. At the same time, Mr. Ambrose explained, contesting the drug charges on a technical defense—i.e., that there existed multiple drug conspiracies rather than the single, unified conspiracy alleged by the government—would provide support for one aspect of Mr. Ambrose's trial theme, *viz.*, that the government had overcharged Smith both with respect to the drug conspiracy counts and with respect to the gun counts.

This Court credits Mr. Ambrose's explanation as to his trial strategy and further finds that his decision did not fall below any objective standard of reasonableness. Smith's argument to the contrary is premised on the assumption that the defense team's trial strategy produced no likely benefit and merely subjected Smith to the loss of credit for his acceptance of responsibility. However, this assumption is flawed. As Mr. Ambrose explained, there was a tactical advantage to contesting the drug conspiracy counts inasmuch as it supported the general theme that the government was overcharging Smith and making more out of his activities than the evidence would support. The attack on the drug conspiracy counts thus logically supported Smith's attack on the gun counts in a thematic sense.

Smith objects that his counsel's trial strategy jeopardized his ability to obtain a sentence reduction for acceptance of re-

---

(6th Cir.1992) (concluding that jury must specify which category or categories of weapons is unanimously has found the defendant used or carried).

In any event, we note that the superseding indictment specifically charged Smith with using and carrying a semiautomatic weapon with a barrel extension and compensator. These characteristics were similarly specified in the jury charge and on the special interrogatory form. Thus, a conviction would have meant that the jury found Smith used this specific type of firearm, arguably warranting an enhancement.

8. The Court recognizes that, under the Supreme Court's subsequent decision in *Bailey v. United States*, 516 U.S. 137, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995), Smith would have ultimately have been vindicated on the § 924(c)(1) charges. However, Mr. Ambrose could not have foreseen this outcome with any degree of certainty at the time he and Smith devised their trial strategy. On a § 2255 motion, we must consider the circumstances facing counsel at the time the allegedly ineffective decision was made, not in hindsight.

sponsibility. But when we examine the alternatives that Mr. Ambrose was presented with at the pre-trial stage, it is clear that his advice to defend against Counts 1 and 2 was not ineffective. If Smith had proceeded to trial on the gun counts alone, there were still substantial risks that he faced. For example, Mr. Ambrose might reasonably have expected that, even if Smith could successfully defend the gun charges and could also demonstrate his acceptance of responsibility, he might receive no more than a 2–level reduction in his offense level.[9] This in turn would have reduced his minimum jail exposure by 47 months.[10] Yet there was also the danger that, if Smith lost on one or more of the gun counts, he would face a mandatory consecutive term of at least 60 months in prison; and possibly upwards of thirty years or more, in addition to the sentence that would undoubtedly be imposed on the drug offenses. Further, if Smith had lost on even one of the gun charges, his argument for acceptance of responsibility would have been compromised, notwithstanding his guilty plea on the drug counts.[11] And, as previously discussed, Mr. Ambrose could reasonably have believed that the prospect of a conviction on the gun counts was greater if Smith were to plead guilty on the drug conspiracy counts.

Under the circumstances, it was not unreasonable for Mr. Ambrose to believe that Smith was better off contesting both the gun counts and the drug conspiracy counts. If he could successfully defend the drug conspiracy charges, there was at least some potential that this might help Smith successfully defend the gun counts also. At the same time, a conviction on the drug conspiracy counts would not adversely affect the amount of drugs attributable to Smith under the relevant conduct provisions of the sentencing guidelines, for purposes of determining Smith's base offense level. Moreover, Mr. Ambrose had a good-faith, colorable argument as to why Smith should receive credit for acceptance of responsibility, notwithstanding his decision to raise a technical defense to Counts 1 and 2. In sum, then, we find there were objectively valid grounds for Mr. Ambrose's belief that his trial strategy was the best alternative.

9. Pursuant to § 3E1.1of the United States Sentencing Guidelines, a defendant gets a 3–level reduction only if he has assisted authorities in the investigation or prosecution of his own misconduct by taking one or more of the following steps: (1) timely providing complete information to the government concerning his own involvement in the offense; or (2) timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the court to allocate its resources efficiently. U.S.S.G. § 3E1.1(b) (1994). In Smith's case, even if he had pleaded to the drug charges, it is likely that most or all of the same evidence would have needed to be presented at trial in order for the government to prosecute the gun counts, since the drug activity served as the predicate offense for the § 924(c) charges.

10. Smith ultimately received a term of imprisonment of 240 months. Based on the offense level of 38 and a criminal history category of I, his potential imprisonment under the sentencing guidelines ranged from 235 months to 293 months. Under the U.S.S.G. sentencing table, a two-level reduction for acceptance of responsibility (i.e., offense level 36 and criminal history category 1) would produce a sentencing range of 188 to 235 months. Thus, Smith's potential prison exposure for his drug crimes would have been lowered by 47 months (235 months minus 188 months).

11. A reduction in sentence for acceptance of responsibility is to be applied only after multiple counts are combined, such that responsibility must be accepted for all counts to warrant a reduction, as opposed to being applied individually to each count. *See United States v. Cohen,* 171 F.3d 796, 806 (3d Cir.1999); *United States v. McDowell,* 888 F.2d 285, 293 (3d Cir.1989). *Accord United States v. Chambers,* 195 F.3d 274, 278–79 (6th Cir.1999); *United States v. Ginn,* 87 F.3d 367, 370–71 (9th Cir.1996); *United States v. Kleinebreil,* 966 F.2d 945, 953 (5th Cir.1992). Therefore, the fact that Smith might have pleaded guilty on the drug counts would not necessarily have helped him establish his acceptance of responsibility if he was later convicted on even one of the gun counts.

Furthermore, even in Smith retrospectively doubts the wisdom of Mr. Ambrose's trial strategy, he was not prejudiced by it. The circumstances of Smith's case made it most unlikely that he would receive credit for acceptance of responsibility in any event. Pursuant to § 3E1.1 of the United States Sentencing Guidelines, application note 4, a finding that the defendant has obstructed justice ordinarily precludes a sentence reduction for acceptance of responsibility.[12] *See* U.S.S.G. § 3E1.1, application note 4 (1994). At sentencing, this Court found that an enhancement for obstruction of justice was appropriate based on Smith's pre-arrest conduct. Although the Guidelines allow for an exception to this rule in "extraordinary cases," *id.,* there is nothing about Smith's case which suggests this exception would have applied. Thus, while the Court did not need to reach the issue of whether Smith's obstruction of justice independently precluded credit for acceptance of responsibility—because it rejected Smith's alleged acceptance of responsibility argument on the merits—this factor alone made it most unlikely that Smith would have received a sentence reduction for acceptance of responsibility.

Smith submits that, irrespective of whether Mr. Ambrose's strategy was reasonable, it was never in fact advanced to the jury. As noted *supra,* he also claims that Mr. Ambrose never provided him any explanation as to *why* strategically Counts 1 and 2 were being defended. The implication is that Mr. Ambrose has constructed his alleged trial theory as a post-hoc justification for his conduct.

Having originally presided over Smith's criminal case, and having again carefully reviewed the relevant parts of the record, the Court finds that Mr. Ambrose's trial strategy was in fact employed and is not a mere post-trial fabrication. It is true that Mr. Ambrose primarily defended the gun counts by arguing a *Bailey*-type argument—that there simply was no connection between Smith's possession of firearms and his drug activity. This was undoubtedly Smith's strongest and most obvious defense in light of the evidence and the one that the jury apparently accepted in declining to convict Smith. Nevertheless, it is evident from the record that Mr. Ambrose also attacked the firearms charges more generally by suggesting that the government had overcharged with respect to both the gun counts and the drug conspiracy counts.

We note, for example, that it was part of the government's case to show an "escalation" in Smith's drug activities in terms of his progression from steroids to larger and larger amounts of marihuana, involving larger sums of cash, sophisticated electronic devices, and more weapons, all of which the government argued were attributes of Smith's drug business. (*See* Tr. 9/6/95 [Doc. No. 208] at 41–43.) The government clearly urged that Smith was using his sophisticated weaponry to further his conspiracy. (*Id.* at 56, ll. 14–25.) In his opening argument to the jury, Mr. Ambrose attempted to counter this image by arguing that the government was engaging in an "arbitrary and selective" prosecution of Smith based on the testimony of unreliable witnesses. (*Id.* at 60.) Mr. Ambrose also attempted to counter the image of Smith as a big-time drug dealer by referencing the fact that Smith and his friends were bodybuilders, for whom the use of steroids were commonplace. (*Id.* at 97–98.) He pursued his *"Bailey"*-type defense by representing that Smith never actively pointed or shot a gun at anyone or used a gun to threaten anyone. (*Id.* at 64, 97.)

There were two major themes in Mr. Ambrose's opening argument. First, the defense argued that the government had cut deals with these untrustworthy witnesses (e.g., liars, drug dealers, and con-

---

12. Smith argues that Mr. Ambrose was ineffective in failing to make an appellate challenge to this Court's application of the obstruction-of-justice enhancement. For the reasons discussed, *infra,* this argument is not well-taken.

victed felons) in order to prove a large, unified conspiracy which did not exist. (Tr. of 9/6/95 [Doc. No. 208] at 61–62.) Mr. Ambrose's second point was that the government's gun charges were likewise overstated and were nothing more than an assault on the private ownership of weapons. (*Id.* at 62.) These issues were repeatedly structured together, e.g.:

> ... It's not in issue that [Smith] used steroids, that he bought steroids, that he traded steroids, that he sold steroids, but that doesn't mean that he is guilty of what is charged in Count 2 of this indictment.
>
> It is not in issue that he used marijuana, that he bought marijuana, that he traded marijuana, that he sold marijuana, but that doesn't mean that he is guilty of what is charged in Count 1 in this indictment.
>
> And it's not in issue that he owned these firearms, that he possessed these firearms but, again, that's not a crime and that doesn't mean that he is guilty of anything that is charged in this indictment.

(*Id.* at 68.) Mr. Ambrose again stressed the pairing of these attacks when he argued that there were "two critical issues" in the case: first, whether there was an overall unified conspiracy, and second, whether the firearms were an integral part of the alleged drug activity. (*Id.* at 68–69.) Mr. Ambrose suggested that both questions would be answered in the negative. (*Id.*) Thus, from the start of the his case Mr. Ambrose packaged his defense of the drug counts with his defense of the gun counts.

The arguments at the close of Smith's case reinforce these themes. The Assistant United States Attorney, for example, argued that the "amount of evidence shows you a level of sophistication and a lifestyle consistent with one who was an organizer of a large-scale marijuana distribution scheme as well as a steroid conspiracy." (Tr. 9/20/95 [Doc. No. 216] at 43.) The prosecutor again played on this image when he noted that Smith's various weapons "were offered to you to demonstrate

the level of sophistication as tools of the trade as a drug dealer ..." (*Id.* at 53.) Thus, the prosecution generally sought to portray Smith as the organizer of a large-scale conspiracy who used weapons as tools of his trade.

In his closing argument for the defense, Mr. Ambrose returned to his theme that the case involved the arbitrary and selective prosecution of Smith through the unreliable testimony of desperate people. (Tr. of 9/20/95 [Doc. No. 216] at 81.) Mr. Ambrose again stressed that the government had not proved the existence of a single, unified conspiracy. (*Id.* at 82.) He reiterated his argument that the government was making a fundamental assault on the legal possession of firearms. (*Id.* at 83.) And, again, Mr. Ambrose emphasized what he felt were the "two critical issues" in the case: "first ... was there a big, overall unified conspiracy as charged?" and "second, were the firearms an integral, absolute essential part of the distribution of any steroids or pot?" (*Id.* at 84.) Mr. Ambrose argued that there had been a failure of prove as to both issues. Again, he attempted to counter the government's image of Smith as a sophisticated drug dealer by arguing that the government had "overcharged" Smith on the gun and drug conspiracy counts. (*Id.* at 110.)

After careful review of the record, we find that Mr. Ambrose's explanation regarding the reasons for his recommended trial strategy are credible and are adequately borne out by the record. Succinctly stated, the government's theme at trial was that Smith was a large-scale drug dealer who needed and used firearms to support and protect his business. Mr. Ambrose generally attacked this proposition by arguing that the government was overcharging Smith and making more of his activities than the evidence would support. Mr. Ambrose advanced this theme with respect to both the drug conspiracy charges and the gun charges, which were consistently structured together as the two broad issues of the case. Thus, Mr. Am-

brose's defense of the drug conspiracy counts fit logically with his parallel attack on the gun counts. By arguing that the government had overcharged Smith with respect to the drug conspiracies, Mr. Ambrose could then urge the jury to infer that Smith had likewise been charged too broadly on Counts 7 and 9.

The credibility of Mr. Ambrose's explanation of his trial strategy is further buttressed by his statements at Smith's sentencing. In arguing for Smith's acceptance of responsibility, Mr. Ambrose recounted the defense team's position at trial:

> ... In our opening argument, I indicated that [Smith] was guilty of various conspiracies. That there were a multitude of conspiracies. That the counts, as plead [sic] and drafted, were defective as it related to the facts in the case ...
>
> \*   \*   \*   \*   \*   \*
>
> I never disputed the fact that he was involved with other people, Your Honor, but, again, I put it in the same category as the gun counts. The gun counts were defective also.
>
> \*   \*   \*   \*   \*   \*
>
> ... We had basically two categories of defectively drawn counts, as far as I was concerned.
>
> \*   \*   \*   \*   \*   \*
>
> I mean, Your Honor, we took issue with the beginning and end of this indictment. And I put them in the same can, because we had defective counts. ...

(Tr. of 12/27/95 Sentencing [Doc. No. 199] at 54–56.) These passages tend to buttress Mr. Ambrose's explanation of the message that he was attempting to convey to the jury during Smith's trial.

In large measure, Smith now challenges the credibility of Mr. Ambrose's professed tactics by pointing out what Mr. Ambrose *did not* argue to the jury. Principally, Smith objects that Mr. Ambrose never directly articulated to the jury his theory that an individual who was the leader of many, singular drug conspiracies would be less likely to use guns in connection with his drug business than an individual who was a leader of a single, unified conspiracy. He points out that, in either case, the amount of drugs and money involved were the same, regardless of the number of conspiracies involved. Furthermore, Smith argues, it is obvious that the jury did not accept the Mr. Ambrose's alleged trial theory because they convicted Smith on the unified conspiracy charges, yet acquitted him on the gun charges.

Smith's arguments are not persuasive. It may be true that Mr. Ambrose did not articulate his professed trial theory to the jury as clearly as he has in connection with Smith's § 2255 motion. In light of all the issues that Mr. Ambrose had to contend with during the course of Smith's trial, that is hardly surprising. Nevertheless, we find, for the reasons previously discussed, that the record does support Mr. Ambrose's attempt to attack the gun charges by wedding his defense of those counts with his defense of the drug conspiracy counts. In so finding, the Court credits Mr. Ambrose's testimony that he attempted to present his defense in a manner which lay persons on the jury could understand. Moreover, we find that it was not objectively unreasonable for Mr. Ambrose to believe that his attack on the drug conspiracy charges lent support to his attack on the gun counts. By arguing that there was a failure of proof on the drug conspiracy charges, Mr. Ambrose was effectively challenging the government's portrayal of Smith as a sophisticated and dangerous international drug dealer. At the same time, Mr. Ambrose was providing a basis for the jury to infer that Smith had been overcharged with respect to the gun counts as well. Finally, the fact that the jury may not have "bought" Mr. Ambrose's argument is irrelevant. The issue at present is whether Mr. Ambrose's conduct in defending Smith was appropriate under an objective reasonableness standard, not whether his conduct ultimately persuaded the jury.

Fundamentally, Smith's invitation to retrospectively critique the clarity of his counsel's trial presentation is exactly the type of judicial second-guessing that we are forbidden to undertake. *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052 ("Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."). It must be remembered that "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686, 104 S.Ct. 2052. In this case, the Court has no doubt that the adversarial process produced a fair result for Smith, thanks—in no small part—to the valiant efforts of his attorneys. Because Smith has failed to overcome the presumption that, under the circumstances, Mr. Ambrose's challenged action "might be considered sound trial strategy," *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052 (citation omitted), his first argument for ineffectiveness of counsel is rejected.

### B.

Smith next argues that his attorney was ineffective at time of sentencing because he failed to bring to this Court's attention certain evidence which, according to Smith, would have demonstrated that a base offense level of 28, rather than 30, was appropriate in his case. A base offense level of 28 applies where the amount of marihuana at issue is at least 400 kilograms but less than 700 kilograms. U.S.S.G. § 2D1.1(c) (1994). Where the amount of marihuana is at least 700 kilograms but less than 1,000 kilograms, a base offense level of 30 applies. *Id.*

In Smith's Position with Respect to Sentencing Factors, his trial counsel argued that Smith was responsible for approximately 500 kilograms of marihuana, producing a base offense level of 28. The government countered that Smith was responsible for 1,120.5 kilograms, yielding a base offense level of 32. This Court ultimately found that the total amount of marihuana or marihuana-equivalent drugs for which Smith was responsible under the relevant conduct provisions of the sentencing guidelines was 866.3 kilograms. Accordingly, the Court applied a base offense level of 30. This figure was based on the following findings: (a) that the June 1994 shipment of marihuana which Smith subsequently stored in his trailer consisted of 453.6 kilograms (roughly 1,000 pounds); (b) that the amount of marihuana mailed or delivered through common carriers was approximately 317 kilograms (or approximately 700 pounds); (c) that Smith obtained an additional 45.3 kilograms of marihuana (or approximately 100 pounds) as the result of a trip to Knoxville, Tennessee in the Spring of 1994; and (d) that the balance of marihuana and marihuana-equivalent steroids found in the storage locker, Aquacide buckets, etc., totaled approximately 50.4 kilograms (approximately 110.88 pounds).

Smith contends that Mr. Ambrose was ineffective in failing to bring to the Court's attention certain evidence which contradicted the Court's findings with respect to the first three categories of marihuana. In general, Smith claims there was evidence in the record showing that the relevant amount of marihuana was less than 700 kilograms, thereby making an offense level of 28 applicable. We first address Smith's arguments with respect to the weight of the marihuana shipped to him through the mail and/or common carrier. Because this argument is dispositive, we need not address the remaining arguments concerning the weight of the drugs.

### (1)

■ Smith criticizes Mr. Ambrose's failure to bring to this Court's attention evidence which would have shown that the amount of marihuana Smith received through mail and courier deliveries was

substantially less than 317.52 kilograms (approximately 700 pounds). At Smith's trial, Maria Zafiropoulos testified about certain marihuana shipments that Smith received during the summer of 1993. Zafiropoulos recalled many occasions when Smith had received shipments in pairs totaling 100 pounds in weight—one shipment typically weighing approximately 60 pounds and the other weighing approximately 40 pounds. When questioned about the number of these 100–pound shipments that Smith had received, Zafiropoulos estimated there had been "very easily 10 or 15." The Court credited Zafiropoulos's conservative estimate and found that Smith had received at least 1,000 pounds of marihuana shipments through the mail or courier deliveries. The Court then reduced this amount by 300 pounds to account for packaging materials, thus arriving at a total amount of 700 pounds in marihuana.

However, Haas had testified at trial that Smith had received shipments of marihuana weighing "50 or 100 pounds." Smith now asserts that, if Mr. Ambrose had reminded the Court of this testimony, there is a reasonable probability that the Court would have discounted Zafiropoulos's estimate even further. Smith claims that a reduced level would have been even more clearly assured had defense counsel brought to the Court's attention the fact that Haas, during his police interviews, had stated that the amounts shipped to Smith weighed between 5 and 10 pounds each—not the 50 to 100 pounds that he testified about at trial.[13]

At the § 2255 hearing, Mr. Ambrose explained that he did not press Haas's testimony about the shipment weights to the Court because the evidence suggested that Haas and Zafiropoulos might well have been talking about different shipments. Mr. Ambrose therefore wanted to avoid the possibility that this Court might decide to aggregate the shipments about

which Zafiropoulos and Haas respectively testified, thereby arriving at a much higher figure that 700 pounds.

The Court credits the testimony of Mr. Ambrose and finds that counsel's performance in this respect did not fall below any objective standard of reasonableness. While the record was unclear whether Haas and Zafiropoulos were testifying about the same shipments, it would have been entirely reasonable for this Court to have inferred that they were talking about distinct shipments. For example, when Zafiropoulos recounted Smith's activities in arranging for marihuana shipments to vacant residences, she recounted the involvement of Smith's co-defendant Sean Gannon but never mentioned any involvement on the part of Haas. Thus, a strong argument could be made that Haas and Zafiropoulos were talking about the different episodes. The Court also notes that, in addition to the testimony of Zafiropoulos and Haas, there was testimony from Tracie Meade (Smith's live-in girlfriend at the time) about the shipments that Smith had received through the mail. Meade recalled Smith having received marihuana shipments on at least 5 to 10 occasions. Because Meade and Zafiropoulos were not friends with each other and were apparently competing for Smith's affection, it would have been entirely reasonable for this Court to infer that Meade and Zafiropoulos did not share information with each other and were each testifying about different marihuana shipments. Notwithstanding all of the evidence that could have cumulatively suggested a much greater amount of marihuana, Smith's counsel effectively prevented the aggregation of these amounts and persuaded this Court to adopt the extremely conservative figure of 700 pounds.

Smith also criticizes Mr. Ambrose for not effectively impeaching Zafiropoulos regarding her estimation of the marihuana shipments. Smith points out that, in a

---

**13.** Smith initially argued that his counsel had also been ineffective in failing to obtain from the prosecution UPS shipping documents which would have contradicted Zafiropoulos's

testimony about the weight of the shipments. The government has denied that it ever had such documentation and Smith has not pressed this claim.

December 15, 1995 police interview, Zafiropoulos gave somewhat contradictory testimony by stating that Smith's marihuana shipments had initially started out as smaller shipments in the amount of 25 to 30 pounds. But the record shows that, at the sentencing hearing, Mr. Ambrose did attempt to impeach Zafiropoulos's testimony on this point by introducing her grand jury testimony, which was to the same effect.[14] Mr. Ambrose quite reasonably chose to use the grand jury testimony, rather than the police reports, to impeach Zafiropoulos, since the grand jury testimony was given under oath and would be more damaging to her credibility. Further, Ms. Zafiropoulos's credibility was vigorously attacked both at trial and at sentencing by pointing out her drug use, her involvement in insurance scams, and her potential for bias as one of Smith's spurned lovers.

Smith claims that Mr. Ambrose's professed strategy is not credible because, at time of trial, Mr. Weichler attacked Zafiropoulos's credibility on different grounds, none of which involved contradictions in sworn testimony. This argument by Smith is unpersuasive. Zafiropoulos's contradiction concerns the *weight* of marihuana which Smith obtained, an issue more appropriately raised at sentencing than at trial. Smith also complains that, although his attorney quoted from page 25 of Zafiropoulos's sworn grand jury testimony, he was ineffective for failing to cite to page 27, wherein Zafiropoulos told the grand jury that 60 pounds of marihuana was the most marihuana she had observed Smith possess at any one time. This theory requires little comment. Upon review of the record, it is evident that Mr. Ambrose sufficiently challenged Ms. Zafiropoulos's testimony insofar as the weight of the shipments was concerned. The fact that Smith's present counsel might have argued

the issue differently simply cannot sustain a claim of ineffectiveness of counsel. *See Strickland,* 466 U.S. at 689, 104 S.Ct. 2052 ("There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.") Mr. Ambrose's judgment was perfectly adequate and reasonable under the circumstances and Smith has therefore failed to show that his representation fell below an objective standard of care.

In any event, the Court concludes that Smith was not prejudiced by the manner in which Mr. Ambrose addressed the weight of the marihuana shipments. Even if all of Smith's present arguments about the marihuana shipments had been made at time of sentencing, there is no reasonable probability that the outcome would have been different. None of Smith's allegations undermine this Court's confidence in its previous finding with respect to the amount of marihuana Smith received through mail and courier delivery.

(2)

Given this conclusion, we need not address Smith's remaining arguments insofar as they bear on Mr. Ambrose's conduct at sentencing in challenging the weight of the marihuana. Smith has failed to demonstrate a reasonable probability that this Court would have altered its finding that he received 317.52 kg of marihuana (or marihuana-equivalent drugs) through the mail or by courier. Even if we were to accept Smith's current estimations as to the amount of the marihuana involved in the remaining categories of activities (i.e., the amount stored in his trailer, the amount received from Tennessee, and the amounts stored in the storage locker, etc.), his base offense level would not have changed.[15] Accordingly, Smith was not prejudiced by Mr. Ambrose's conduct in challenging the weight of the marihuana.

14. In her grand jury testimony, Zafiropoulos testified that Smith's shipments started out in very small cookie containers weighing approximately 4–10 pounds and gradually escalated into large quantities shipped in Muscle Fuel containers in boxes weighing 60 pounds. (*See* Sent. Tr. at 6, Def.'s Ex. A.)

15. We assume that the Court's finding concerning the amount of drugs mailed to Smith would have remained at 317.52 kg (or 700

**469**

## C.

Smith's final argument is that his attorney was ineffective in failing to make an appellate challenge to this Court's application of a 2–level enhancement for obstruction of justice. In sentencing Smith, this Court found that an enhancement for obstruction of justice was appropriate based on three factors: (i) Smith's request to Haas, shortly before the time of his arrest, that Haas destroy his "bible"—a black book containing evidence of Smith's drug activities; (ii) Smith's actions in removing contraband from his trailer into a storage locker; and (iii) Smith's actions in concealing marihuana bales in the trunk of a Mercedes Benz vehicle. Under § 3C1.1 of the sentencing guidelines, the enhancement is applicable where, e.g., the defendant:

> destroy[ed] or conceal[ed] or direct[ed] or procur[ed] another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding (e.g., shredding a document or destroying ledgers upon learning that an official investigation has commenced or is about to commence), or attempting to do so; however, if such conduct occurred contemporaneously with arrest (e.g., attempting to swallow or throw away a controlled substance), it shall not, standing alone, be sufficient to warrant an adjustment for obstruction unless it resulted in a material hindrance to the official investigation or prosecution of the instant offense or the sentencing of the offender . . .

U.S.S.G. § 3C1.1, Application Note 4(d) (1994).

Smith argues that his actions in urging Haas to destroy his "bible" did not constitute a valid basis for applying an obstruction of justice enhancement because that conduct arguably occurred contemporaneously with Smith's arrest and did not materially hinder the authorities' criminal investigation. Although this issue was disputed at Smith's sentencing hearing, Smith now contends that Mr. Ambrose was ineffective in failing to appeal this Court's application of the § 3C1.1 enhancement. Smith contend that, if the issue had been appealed, there is a reasonable probability that the Court of Appeals would have reversed the judgment and remanded the case for re-sentencing in order to allow this Court an opportunity to determine whether the enhancement would still be imposed even without consideration of Smith's attempts to have his "bible" destroyed.

We find this argument unconvincing. In applying the enhancement, the Court considered the totality of circumstances, which included Smith's conduct in hiding contraband from his trailer and concealing marihuana bales in the Mercedes Benz. These two events occurred on the day prior to Smith's arrest and, thus, could not be considered "contemporaneous" with his arrest under any interpretation of the guideline note. Had Smith's attorneys challenged the enhancement, this Court's finding that Smith obstructed justice would have been subject to a deferential "clearly erroneous" standard of review. See U.S. v. McDowell, 888 F.2d 285, 292 (3d Cir.1989).[16] Thus, application of the

---

pounds). If we accept Smith's calculations that (a) the amount of marihuana in stored in his trailer was 332.07 kg, (b) the amount obtained from the trip to Knoxville, Tennessee was 22.5 kg, and (c) the remaining drugs amounted to no more than 49.88 kg, then the total amount of relevant marihuana (or marihuana-equivalent drugs) would be 721.97 kg. This amount would still place Smith in a base-offense level category of 30.

**16.** Smith cites Williams v. United States, 503 U.S. 193, 112 S.Ct. 1112, 117 L.Ed.2d 341

(1992), for the proposition that a remand is appropriate where the district court based a departure from the guideline range on both valid and invalid grounds. However, Williams does not establish that Smith's sentence would necessarily have been reversed and remanded. In that case, the Supreme Court considered the circumstances under which a reviewing court may affirm a sentence where the district court's departure from the guideline range is based on both valid and invalid factors. The Court held that, in determining whether a remand is

enhancement was well-supported and any challenge to the enhancement would have been a weak, if not futile, point for appellate argument. "[I]t is a well established principle that counsel decides which issues to pursue on appeal," and counsel has "no duty to raise every possible claim." *Sistrunk v. Vaughn,* 96 F.3d 666, 670 (3d Cir.1996) (citing *Jones v. Barnes,* 463 U.S. 745, 751–52, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983)). To the contrary, "the process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Id.* (quoting *Smith v. Murray,* 477 U.S. 527, 536, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986)). In light of the many more deserving issues which Smith's counsel legitimately chose to raise on appeal, it was certainly reasonable for counsel to abandon the obstruction-of-justice challenge.

For the same reason, Smith cannot establish that he was prejudiced by his attorneys' choice of appellate issues. Quite simply, there is no reasonable probability that, but for counsels' actions, the result of Smith's appeal would have been any different. Accordingly, Smith's final argument in support of his § 2255 motion is unavailing.

### III. CONCLUSION

Based upon the foregoing, which constitutes this Court's findings of fact and conclusions of law, Smith's motion to vacate his conviction and sentence will be denied.

required, the reviewing court must decide whether the district court would have imposed the same sentence had it not relied upon the invalid factor. 503 U.S. at 203, 112 S.Ct. 1112. Once the appealing party demonstrates that the sentencing court relied upon an invalid factor, a remand is appropriate unless the reviewing court concludes, on the record as a whole, that the error was harmless in that it did not affect the district court's selection of the sentence imposed. *id.*

Applying the foregoing to this case, we are satisfied that, if the issue of obstruction of justice had been appealed, in all likelihood the Court of Appeals would have affirmed this Court's application of the enhancement because it was obvious from the record that the enhancement was justified even without considering Smith's attempt to destroy his "bible." Nevertheless, even if the Court of Appeals had remanded this case, this Court would undoubtedly have applied the enhancement at time of re-sentencing. Thus, Mr. Ambrose's decision not to appeal the obstruction issue resulted in no prejudice to Smith.